# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 16-1276C
(Filed: June 6, 2022)

| | |
|---|---|
| **CITY OF FRESNO**, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES,** | )   Central Valley Project: |
| | )   Breach of Contract; |
| *Defendant*, | )   Superior Water Rights |
| and | ) |
| | ) |
| **SAN LUIS & DELTA-MENDOTA** | ) |
| **WATER AUTHORITY,** *et al.*, and | ) |
| **CENTRAL CALIFORNIA** | ) |
| **IRRIGATION DISTRICT,** *et al.*, | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

*Nancie G. Marzulla* and *Roger J. Marzulla*, Marzulla Law, LLC, Washington, DC, for plaintiffs.  With them on the briefs was *Cindy Lopez*, Marzulla Law, LLC, Washington, DC. *Craig A. Parton* and *Timothy E. Metzinger*, Price, Postel & Parma LLP, Santa Barbara, CA, Of Counsel.

*Matthew J. Carhart*, Trial Attorney, Commercial Litigation Branch, Civil Division U.S. Department of Justice, Washington, DC, for defendant.  With him on the briefs were *Michael D. Granston*, Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Elizabeth M. Hosford*, Assistant Director, and *Vincent D. Phillips, Jr.*, Senior Trial Counsel, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC.  *Amy L. Aufdemberge*, Office of the Solicitor, U.S. Department of Interior, Washington, DC, Of Counsel.

*Daniel J. O'Hanlon*, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for defendant-intervenor San Luis & Delta-Mendota Water Authority.  *Rebecca R. Akroyd*, San Luis & Delta-Mendota Water Authority, Sacramento, CA, Of Counsel.

*Andrew E. Shipley*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for defendant-intervenor Westlands Water District.  *Daniel S. Volchok*, *Philip E. Beshara*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, *Jon D. Rubin*, Westlands Water District, Fresno, CA, Of Counsel.

*Anthony Fulcher*, Santa Clara Valley Water District, San Jose, CA, for defendant-intervenor Santa Clara Valley Water District.

*Thomas M. Berliner*, Duane Morris LLP, San Francisco, CA, for defendant-intervenor San Luis Water District.

*Paul R. Minasian*, Minasian, Meith, Soares, Sexton & Cooper, LLP, Oroville, CA, for defendant-intervenors San Luis Canal Company, Central California Irrigation District, Firebaugh Canal Water District, Columbia Canal Company, and San Joaquin River Exchange Contractors Water Authority.

*Ellen L. Wehr*, Grassland Water District, Los Banos, CA, for defendant-intervenor Grassland Water District.

*David T. Ralston, Jr.*, Foley & Lardner LLP, Washington, DC, for defendant-intervenors Byron Bethany Irrigation District, Del Puerto Water District and James Irrigation District. *Frank S. Murray*, *Anna S. Ross*, *Micah Zomer*, *Julia Di Vito*, Foley & Lardner LLP, Washington, DC, Of Counsel.

**OPINION AND ORDER**

***BONILLA, Judge.***

Between 2012 and 2017, the State of California experienced a historic drought, prompting the Governor to declare a Drought State of Emergency from January 17, 2014, through April 7, 2017.[1]  This case arises out of the difficult decisions made by the United States Bureau of Reclamation (Reclamation) in 2014 in managing and allocating the limited supply of water regulated through the Central Valley Project (CVP); more specifically, the allocation of San Joaquin River water between and among parties with competing contractual rights while complying with federal, state, and local environmental laws and regulations.[2]

Plaintiffs, including the City of Fresno and seventeen irrigation districts in California, filed this action claiming that the decisions made by Reclamation in 2014 effected a taking of their property (in the form of water and water rights) in violation of the Fifth Amendment to the

---

[1] *See* https://www.ca.gov/archive/gov39/2014/01/17/news18368/index.html (Governor Brown Declares Drought State of Emergency) (last viewed June 2, 2022); https://www.ca.gov/archive/gov39/2017/04/07/news19748/index.html (Governor Brown Lifts Drought Emergency, Retains Prohibition on Wasteful Practices) (last viewed June 2, 2022).

[2] On January 8, 2021, plaintiffs filed a nearly identical case challenging Reclamation's *2015* water allocations. *See City of Fresno v. United States*, No. 21-375 (Fed. Cl.).  That matter is stayed pending the entry of final judgment in this case.

United States Constitution as well as a breach of contract.[3]  ECF 128-1.  On March 25, 2020, this Court dismissed plaintiffs' takings claim for lack of standing, concluding that "none of the Plaintiffs possesses a property interest in the water supplied to them by or through Reclamation."[4]  *City of Fresno v. United States*, 148 Fed. Cl. 19, 34 (2020).  Pending before the Court are the parties' cross-motions for summary judgment on the breach of contract claim.[5]  For the reasons set forth below, plaintiffs' motion for partial summary judgment is **DENIED** and defendant's and defendant-intervenors'[6] cross-motions for summary judgment are **GRANTED** as to liability.

# BACKGROUND

## I.   HISTORICAL CONTEXT[7]

### A.  <u>Central Valley Project</u>

"The [CVP] is the largest federal water management project in the United States[,]" built to reengineer natural water distribution "to serve the water needs in California's Central Valley Basin."  *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1349 (Fed. Cir. 2009), *aff'd in part on reh'g*, 638 F.3d 781 (Fed. Cir. 2011).  Initiated by the State of California,

---

[3] Prior to the commencement of this case, a similar action was filed in the United States District Court for the Eastern District Court of California.  After several rulings, including a denial of a motion to transfer the case to this Court, plaintiffs voluntarily dismissed the district court action and filed suit in this Court.  *See Friant Water Auth. v. Jewell*, 23 F. Supp. 3d 1130 (E.D. Cal. 2014) (temporary restraining order denied); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 2197567 (E.D. Cal. May 27, 2014) (motion to intervene granted); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 5325352 (E.D. Cal. Oct. 17, 2014) (motion to intervene granted); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 6774019 (E.D. Cal. Dec. 1, 2014) (motion to transfer denied).

[4] The Court also dismissed the breach of contract claims brought by individual landowners for lack of standing. *City of Fresno*, 148 Fed. Cl. at 30-31 (individual landowners were neither parties to nor third-party beneficiaries of the water supply contracts at issue).

[5] In their dispositive cross-motions, defendant and defendant-intervenors also sought summary judgment on plaintiffs' claims for expectancy damages.  In a July 30, 2021 Joint Post-Discovery Status report, moreover, the parties highlighted a series of disputes concerning the appropriate calculation of potential damages as well as expert discovery and the reliability of expert opinions.  *See* ECF 202.  During oral argument, the Court announced it would bifurcate the issues of liability and damages and defer ruling upon defendant's and defendant-intervenors' dispositive motions insofar as they addressed issues related to damages.  Tr. at 12 (Apr. 28, 2022) (ECF 226).

[6] Defendant-intervenors include: the San Luis & Delta-Mendota Water Authority along with its member districts (i.e., Westlands Water District, Santa Clara Valley Water District, Grassland Water District, San Luis Water District, James Irrigation District, Byron Bethany Irrigation District, and Del Puerto Water District) (collectively the District Intervenors); and the Central California Irrigation District, San Luis Canal Co., Firebaugh Canal Water District, Columbia Canal Co., and San Joaquin River Exchange Contractors Water Authority (collectively the Exchange Contractor Intervenors).

[7] The Court's March 25, 2020 Opinion and Order summarized the historical background and procedural history of this case.  *See City of Fresno*, 148 Fed. Cl. at 23-29.  To provide context for the analysis herein, the Court provides a brief recapitulation.

the federal government assumed control over the CVP in 1935 and, two years later, assigned construction and operational responsibilities to Reclamation.  *Stockton E.*, 583 F.3d at 1349. Extending hundreds of miles through central California, the CVP comprises a complex network of dams, reservoirs, hydroelectric powerplants, canals, and other water storage and conveyance infrastructure.  *Id.*; *see also United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950). Through this network of facilities, the CVP captures, regulates, and redistributes the natural water flows of the San Joaquin River in the south and the Sacramento River in the north, refreshing arid land in the Central Valley and "mak[ing] water available where it would be of greatest service."  *Gerlach Live Stock*, 339 U.S. at 728-29.

To secure the water rights necessary to construct and operate the CVP, discussed *infra*, Reclamation entered into a series of purchase contracts and exchange contracts (hereinafter "Exchange Contract") [8] with holders of water rights on the San Joaquin River.  Plaintiffs thereafter entered into water-supply contracts with Reclamation to receive water through CVP's Friant Division (hereinafter "Friant Contract").[9]

In the southern portion of the Central Valley, San Joaquin River water is impounded by the Friant Dam (one of the initial CVP facilities constructed), diverted from its natural course, and forced into the Millerton Lake reservoir.  *See, e,g.*, *Westlands Water Dist. v. United States* (*Westland I*), 153 F. Supp. 2d 1133, 1146 (E.D. Cal. 2001), *aff'd*, 337 F.3d 1092 (9th Cir. 2003). From there, through the associated Friant-Kern Canal to the south and Madera Canal to the north, Reclamation is able to furnish the diverted San Joaquin River water to plaintiffs in accordance with the Friant Contract.  *See generally* ECF 204-4.

Aside from reengineering water flows for irrigation and other agricultural needs, the CVP serves numerous other beneficial uses and is subject to myriad statutory and regulatory requirements regarding water usage.  *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 682-83 (9th Cir. 2012) (discussing Reclamation's various obligations in operating the CVP).  In 1992, for example, Congress passed the Central Valley Project Improvement Act (CVPIA) to, inter alia, "achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors."  Pub. L. No. 102–575, § 3402, 106 Stat. 4600, 4706 (1992).

---

[8] Unless otherwise specified, references to the "Exchange Contract" are citations to the 1968 "Second Amended Contract for Exchange of Waters" (ECF 204-3), operative in 2014.  References to the "Exchange Contractors" are to private parties to the Exchange Contract or their successors-in-interest, including defendant-intervenors.

[9] Unless otherwise specified, citations to the "Friant Contract" herein refer to the 2010 "Contract Between the United States and Arvin-Edison Water Storage District Providing for Project Water Service from Friant Division and for Facilities Repayment" (ECF 204-4), operative in 2014.  The model Friant Contract is representative of the contracts at issue for use of CVP water from the Friant Division, which are substantively identical.  References to the "Friant Contractors" herein are to the private parties to the Friant Contracts at issue, namely, the remaining plaintiffs.

## B.  **Substitute Water Delivery Under the Exchange Contract**

Diversion of San Joaquin River water at the Friant Dam was made possible by Reclamation's acquisition of water rights from the Exchange Contractors, who "hold riparian and pre-1914 appropriative rights to the San Joaquin River water south of Friant."  *Westland I*, 153 F. Supp. 2d at 1146-47.  The acquisition was accomplished through: (1) a series of purchase agreements executed in 1939 by which the Exchange Contractors sold all of their San Joaquin River water rights to the United States, except and in excess of reserved waters measured by specified rates of flow in Schedule 1 of the contact, *see* ECF 204-1 at 4-5 (Articles 7 & 9); and (2) a series of exchange contracts simultaneously executed in 1939, which authorized the United States to "store and divert" the reserved waters in exchange for an agreement to provide "substitute water equivalent in quantity," s*ee* ECF 207-1 at 6-7 (Article 5).

The 1939 Exchange Contract was subsequently amended in 1956 and, again, in 1968. *See* ECF 204-2, 204-3.  The 1968 Exchange Contract governs Reclamation's water delivery obligations to the Exchange Contractors in 2014 (i.e., the year at issue).  Article 4(a) of the 1968 Exchange Contract, titled "Conditional Permanent Substitution of Water Supply," provides that the United States can use the San Joaquin River reserved waters "so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise substitute water in conformity with this contract."  ECF 204-3 at 7-8.  Article 8, quoted more fully below, specifies the "Quantity of Substitute Water":

> During all calendar years, other than those defined as critical, the United States shall deliver to the [Exchange Contractors] for use hereunder an annual substitute water supply of not to exceed 840,000 acre-feet in accordance with the [specified] maximum monthly entitlements[.]

*Id.* at 18-19.  During critical years where water supply is deficient, the annual delivery quantity is reduced by approximately twenty-five percent to 650,000 acre-feet.  *Id.* at 19-20.

Since 1951, Reclamation has stored and diverted the Exchange Contractors' reserved San Joaquin River water at the Friant Dam and supplied them with substitute water through the Delta-Mendota Canal.  *See* ECF 204-3 at 4-6 (Explanatory Recitals).  Until 2014, moreover, the sole source of substitute water Reclamation used to address its water delivery obligations to the Exchange Contractors was water from the Sacramento-San Joaquin River Delta.  *See, e.g.*, ECF 204-12 at 2 (press release); ECF 204-7 at 2 (allocation letter).

## C.  **Water Supply Service Under the Friant Contract**

The Friant Contractors contracted with Reclamation to access water from the Friant Division, namely the San Joaquin River water impounded at the Friant Dam.  *See generally* ECF 204-4.  Pursuant to Article 3(a) of the Friant Contract, "each year, consistent with all applicable State water rights, permits, and licenses, Federal law, the Settlement including

the [San Joaquin River Restoration Settlement Act (SJRRSA)[10]], and subject to the provisions set forth in Articles 12 and 13 of this Contract, the Contracting Officer shall make available" specified quantities of water to plaintiffs.  *See* ECF 204-4 at 18.  Relevant here, Article 12 of the Friant Contract provides:

> The Contracting Officer shall make all reasonable efforts to optimize delivery of the Contract Total subject to: . . . (ii) the requirements of Federal law and the [San Joaquin River Restoration] Settlement; and (iii) the obligations of the United States under existing contracts, or renewals thereof, providing for water deliveries from the [CVP].

*Id.* at 48 (Article 12(a)).

Article 13, in turn, memorializes Reclamation's agreement that, in operating the CVP, the Contracting Officer "will use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the [Friant Contractors]."  *Id.* at 49 (Article 13(a)).  Limiting the government's liability under this provision, Article 13(b) states:

> If there is a Condition of Shortage because of errors in physical operations of the [CVP], drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations, including but not limited to obligations pursuant to the Settlement then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

*Id.* at 50.  Article 19(a), in pertinent part, provides: "Where the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations."  *Id.* at 58.

Finally, Article 3(n) provides that the Friant Contractors' rights "are subject to the terms" of the Exchange Contract.  *Id.* at 24.  It further states, however, that

> The United States agrees that it will not deliver to the Exchange Contractors thereunder the water of the San Joaquin River unless and until required by the terms of [the Exchange Contract], and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-

---

[10] The San Joaquin River Restoration Settlement Act, Pub L. 111-11, § 10001, 123 Stat. 991, 1349 (2009), authorized the Secretary of the Interior to implement a historic settlement to, among other things, restore river flows and salmon populations in the San Joaquin River by modifying the operations of the Friant Dam.  *See Wolfsen Lan & Cattle Co. v. United States*, 98 Fed. Cl. 507, 510-11 (2011), *aff'd sub nom. Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Associations*, 695 F.3d 1310 (Fed. Cir. 2012).

San Joaquin Delta those quantities required to satisfy the obligations of the
United States under said Exchange Contract and under [the Purchase Contract].

*Id.*

Since 1962, under the Friant Contract (as drafted and thereafter amended and renewed),
Reclamation has supplied the Friant Contractors with San Joaquin River water impounded at
the Friant Dam and stored in Millerton Lake.[11]  *See* ECF 204-4 at 148 (Friant Contract
Resolution).  In dry years with deficient water supply, Reclamation allocated and distributed to
the Friant Contractors less than the quantities listed in Article 3(a).  *See* ECF 207-1 at 130-39
(historical water allocations).

## II.   2014 WATER ALLOCATIONS

Between May 2013 and May 2014, drought conditions in California intensified from
a "Category D2—Severe Drought" to a "Category D4—Exceptional Drought" (i.e., the most
severe classification listed in the U.S. Drought Monitor).[12]  ECF 204-12 at 3; *see also* ECF 207-1
at 120.  The drought caused scarce water supply with record low storage throughout California
and prompted unprecedented measures in water management.  *See, e.g.*, ECF 207-1 at 120-21.

### A.   Water Allocation to the Exchange Contractors

On February 15, 2014, as required under Article 8 of the Exchange Contract,
Reclamation informed the Exchange Contractors of its determination that 2014 was a critical
year, predicting that it could allocate "336,000 acre-feet rather than the maximum 650,000
acre-feet critical year entitlement."  *Id.* at 121; ECF 204-3 at 19.  In a May 13, 2014 update
letter to the Exchange Contractors, Reclamation announced that "[d]ue to continued drought
and unique hydrology, Reclamation will for the first time provide water from both Delta and
San Joaquin River sources" and "anticipates being able to meet [the] critical year demands
for the months of April through October which totals 529,000 [acre-feet]."  ECF 204-7 at 2.

As of May 14, 2014, there were 279,605 acre-feet of water stored in Millerton Lake.
ECF 204-13 at 2.  The following day, and continuing through September 2014, Reclamation
released water from the Friant Dam into the San Joaquin River for delivery to the Exchange
Contractors.  *See* ECF 204-12 at 2; ECF 207-1 at 115 (Milligan Decl. ¶ 28) ("these releasees
began May 15"); ECF 207-1 at 161 (Milligan Dep. Tr. at 119:19-22) ("October, November,
December . . . no releases were made from Millerton for [E]xchange [C]ontractor purposes.").
In total, Reclamation delivered approximately 540,000 acre-feet of water to the Exchange
Contractors in 2014, of which roughly 209,000 acre-feet were from Millerton Lake and released

---

[11] The beginning year 1962 is recorded in the representative Friant Contract submitted by plaintiffs, which involves
the Arvin-Edison Water Storage District.  *See* ECF 204-4 at 5 (3rd Explanatory Recital).

[12] Information about and a visual description of the U.S. Drought Monitor can be found at https://droughtmonitor.
unl.edu/About/WhatistheUSDM.aspx (last viewed June 2, 2022).

at the Friant Dam,[13] and the balance (roughly 331,000 acre-feet) released from the Delta-Mendota Canal.[14]

### B. Water Allocation to the Friant Contractors

On or about March 5, 2014, as required under Article 4 of the Friant Contract, Reclamation notified plaintiffs that "based upon California Department of Water Resources' February 2014 Water [Y]ear Runoff Forecast, Reclamation had determined that the Friant Division Water supply allocation was zero percent of Class 1 and zero percent of Class 2 for other than public health and safety considerations." *See* ECF 204-8 at 3; ECF 204-4 at 25 (Article 4(a)). As of May 13, 2014, the Friant Contractors' water allocation and supply remained zero. ECF 207-1 at 134. Reclamation ultimately delivered some water to plaintiffs in 2014, including "health and safety" water and "carryover" water from the previous year's allocation. *See, e.g.*, ECF 207-1 at 160 (Jackson Dep. Tr. at 116:17-117:1). The Friant Contractors also secured 6,403 acre-feet of water through transfers from the Exchange Contractors. ECF 204-9 at 4; *see also* ECF 204-5.

## III.   BREACH OF CONTRACT CLAIM

According to plaintiffs, in 2014, despite the drought, Reclamation had a substantial quantity of San Joaquin River water available in the Friant Division, which was captured at the Friant Dam and stored in Millerton Lake. ECF 128-1 at 31 ¶ 46. Plaintiffs allege, however:

> In 2014, the United States breached Plaintiffs' water supply contracts by failing to make available to them the quantities required by Article 3[(a)] of their contracts. . . .

> [T]he United States erroneously determined and asserted that it was required under the terms of the Exchange Contract to provide Defendant-Intervenors, the Exchange Contractors, nearly all the waters of the San Joaquin River available in the Friant Division as substitute water. . . .

*Id.* at 31-32 ¶¶ 46-47. Asserting that the Exchange Contractor allocations exceeded the contractually required amount, plaintiffs maintain that Reclamation's actions breached Articles 3(a) and 3(n) of the Friant Contract. *Id.* at 31-33 ¶¶ 45-48. For plaintiffs, the breach of contract analysis begins and ends with Articles 3(a) and 3(n) of the Friant Contract read in tandem with Article 4 of the Exchange Contract.

---

[13] The total releases at the Friant Dam were 278,400 acre-feet, but due to conveyance losses only 209,000 acre-feet reached the Mendota Pool for delivery to the Exchange Contractors. ECF 204-15 at 3 (Jackson Dep. Tr. at 39:3-18); ECF 204-14 at 2 (Steiner Dep. Tr. at 42:12-23).

[14] Although not material to the liability issues resolved herein, the record includes a slightly different accounting of the water delivered to the Exchange Contractors in 2014. *See* ECF 189-2 at 2 (Steiner Decl. ¶ 4) ("As a matter of record, in 2014 the Exchange Contractors received delivery of 551,436 acre-feet of water, a deficiency of almost 99,000 acre-feet of water.").

Defendant and defendant-intervenors counter that under the express terms of the Friant Contract, the Exchange Contractors have superior CVP water rights to those of the Friant Contractors, and that Article 8 of the Exchange Contract required Reclamation to deliver to the Exchange Contractors the water delivered in 2014. Invoking Articles 13 and 19 of the Friant Contract, defendant and defendant-intervenors further aver that Reclamation's actions are immune or, at least, the Contracting Officer's water allocation decisions—including using San Joaquin River water as substitute water to satisfy the Exchange Contractors' superior entitlements—are subject to a highly deferential "arbitrary, capricious, or unreasonable" standard of review. Lastly, defendant and defendant-intervenors maintain that Article 4(b) of the Exchange Contract was not triggered because at no time in 2014 was Reclamation "unable" to deliver water to the Exchange Contractors from non-San Joaquin River sources.

## DISCUSSION

## I. LEGAL STANDARDS

### A. Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[M]aterial fact[s]," in turn, are those that might "affect the outcome of the suit." *Id.* In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### B. Breach of Contract Claim

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted). Here, the parties do not dispute

the validity of the Friant Contract or the Exchange Contract.  Instead, the dispute centers on the interpretation of the relevant provisions in these contracts regarding Reclamation's water delivery obligations to the Friant Contractors vis-à-vis the Exchange Contractors.  "Contract interpretation is a question of law generally amenable to summary judgment."  *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).

In interpreting a contract, the court must begin with "the plain language of the written agreement."  *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citation omitted).  "If a contract provision is clear and unambiguous, the court may not resort to extrinsic evidence to interpret it."  *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  When the contract provision is ambiguous, the court "may appropriately look to extrinsic evidence to aid in [the] interpretation of the contract."  *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (citing cases).  To demonstrate ambiguity, however, "it is not enough that the parties differ in their respective interpretations of a contract term. . . .  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (citation and quotation omitted).

Further, the court "must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); *accord McAbee Const.*, 97 F.3d at 1435 ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.").  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted).

## II.   ALLEGED BREACH OF THE FRIANT CONTRACT

Central to plaintiffs' breach of contract claim is the nature and scope of Article 3(a) of the Friant Contract.  Titled "Water to be Made Available and Delivered to the Contractor," Article 3(a) provides:

> During each Year, consistent with all applicable State water rights, permits, and licenses, Federal law, the Settlement including the SJRRSA, and subject to the provisions set forth in Articles 12 and 13 of this Contract, the Contracting Officer shall make available for delivery to the Contractor from the Project 40,000 acre-feet of Class 1 Water and 311,675 acre-feet of Class 2 Water for irrigation and M&I purposes.  The quantity of Water Delivered to the Contractor in accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of Articles 4 and 7 of this Contract.

ECF 204-4 at 18.  Plaintiffs' breach of contract claim is based upon Reclamation's failure to deliver Class I Water, defined in Article 1(d) of the Friant Contract:

"Class I Water" shall mean that supply of water stored in or flowing through Millerton Lake which, *subject to the contingencies hereinafter described in Articles 3, 12, and 13 of this Contract*, will be available for delivery from Millerton Lake and the Friant-Kern and Madera Canals as a dependable water supply during each Year[.]

*Id.* at 10 (emphasis added).  Plaintiffs maintain that the inclusion of the obligatory phrase "*shall* make available for delivery" in Article 3(a) of the Friant Contract entitled them to 40,000 acre-feet of Class 1 Water originating from the San Joaquin River and that Reclamation's zero-allocation in 2014 constituted a breach.[15]

Plaintiffs attempt to bolster their argument by citing Article 3(n) of the Friant Contract, which provides:

The rights of the Contractor under this Contract are subject to the terms of the [Exchange Contract of 1939], as amended.  The United States agrees that it will not deliver to the Exchange Contractors thereunder waters of the San Joaquin River unless and until required by the terms of said contract, and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States under said Exchange Contract and under [the Purchase Contract of 1939].

ECF 204-4 at 24.  More specifically, plaintiffs highlight the second sentence of Article 3(n), which constrains Reclamation's use of San Joaquin River water to satisfy its water delivery obligations under the Exchange Contract.

Despite the contract's use of the modal verb "shall," the plain language of Article 3(a) makes clear that the Friant Contractors' expected water deliveries are subordinate to the following: state water rights, permits, and licenses; federal law; the SJRRSA; and, most relevant here, "the *provisions set forth in Articles 12 and 13* of this Contract."  *See* ECF 204-4 at 18 (emphasis added).  Article 12(a), quoted more fully above, subordinates the Friant Contractors' contractual rights to, inter alia, "the obligations of the United States under existing contracts, or renewals thereof, providing for water deliveries from the [CVP]."  *Id.* at 48.  Article 13(b), also quoted more fully above, further exempts Reclamation from the otherwise required deliveries to the Friant Contractors during a "Condition of Shortage" attributable to, among other things, "drought . . . or actions taken by the Contracting Officer to meet legal obligations."  *Id.* at 50; *id.* at 10 ("Condition of Shortage" defined as a "condition respecting the CVP" causing a lesser delivery).  The above-quoted definition of "Class I Water" in Article 1(d) similarly notes

---

[15] In defining "Class 2 Water," Article 1(e) of the Friant Contract contains the following disclaimer, rendering any claimed entitlement unenforceable on its face: "Because of its uncertainty as to availability and time of occurrence, such water will be undependable in character and will be furnished *only if, as, and when it can be made available as determined by the Contracting Officer*[.]"  ECF 204-4 at 10 (emphasis added).

that the Friant Contractors' water delivery is "subject to the contingencies hereinafter described in Articles 3, 12, and 13 of this Contract." *Id.* at 10.

Moreover, despite the language in the second sentence of Article 3(n) relegating Reclamation's use of San Joaquin River waters under the Exchange Contract to last resort status, the first sentence reinforces the fact that the contractual rights of the Friant Contractors are subordinate to those of the Exchange Contractors. *Id.* at 24. In other words, at all times, the Exchange Contractors have a superior claim to CVP water than do the Friant Contractors. Article 3(n) simply requires Reclamation to exhaust other sources of CVP water prior to tapping into San Joaquin River water to satisfy the government's first-in-time, first-in-right delivery obligations to the Exchange Contractors. This exhaustion requirement—not negotiated as part of the Exchange Contract—nevertheless inures to the benefit of the Friant Contractors in giving them the best chance at maximum Class I water delivery by requiring Reclamation to look elsewhere first.[16] However, it does not flip the narrative and prioritize the Friant Contractors' contractual rights over the Exchange Contractors when it comes to San Joaquin River water.

The qualifying clauses included throughout the relevant articles of the Friant Contract (quoted above)—negotiated and agreed to by the Friant Contractors—curtail the impact and effect of the "shall make available for delivery" language of Article 3(a) and must be accorded proper meaning. *Metric Constructors*, 169 F.3d at 753 ("Courts prefer . . . an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless.") (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)); *accord NVT Techs.*, 370 F.3d at 1159 ("When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.") (citing *McAbee Constr.*, 97 F.3d at 1434-35).

Review of the historical context explains the rationale for the agreement memorialized in Article 3(n). As noted above, the Friant Contractors' access to San Joaquin River water derives from the construction of the Friant Dam and the Millerton Lake reservoir as part of the complex and interrelated CVP infrastructure. San Joaquin River water impounded at the Friant Dam is the only source that Reclamation uses to supply water to the Friant Contractors, which refreshes the often-parched land tracts they and their customers occupy. *See Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 560-61, 576-78 (1966) (describing origin and planning of the CVP and uses of San Joaquin River water); ECF 204-4 at 6 (5th & 6th Explanatory Recitals). To do so, Reclamation necessarily acquired the rights to use San Joaquin River water from the Exchange Contractors. *See Gustine Land*, 174 Ct. Cl. at 579-80 (describing Reclamation's acquisition of rights from the Exchange Contractors); *Westland I*, 153 F. Supp. 2d at 1146 ("Absent the cooperation of the Exchange Contractors, this diversion [of San Joaquin River water at the Friant Dam] would not be possible . . . ."). This critical acquisition required the simultaneous execution of two contracts: a purchase of rights to water in excess of waters reserved for cropland irrigation (Purchase Contract); and a commitment to supply "substitute

---

[16] Reclamation's last resort option to use San Joaquin River water to satisfy the government's obligations under the Exchange Contract is underscored by the last sentence of Article 3(n); specifically, the contractual provision identifies alternative sources of substitute water and compels Reclamation to consider not only existing water but "water . . . that may become available." ECF at 204-4 at 24.

water" in exchange for using the reserved waters (Exchange Contract).  *See Gustine Land*, 174 Ct. Cl. at 579-581 (discussing Reclamation's agreements with the Exchange Contractors).

The right to use the San Joaquin River reserved waters acquired by the government through the 1939 Exchange Contract was and remains conditional, requiring a continuous supply of substitute water to the Exchange Contractors.  Article 7 of the original Exchange Contract, titled "Substitute Waters," provides that the United States may use the reserved waters of the San Joaquin River otherwise belonging to the Exchange Contractors "only during those periods when a substitute water supply as [therein] defined is being furnished to the [Exchange Contractors]."  ECF 207-1 at 7.  Although the phrasing of the quoted contract provision evolved in the 1956 and 1968 amendments, the Exchange Contractors retained their entitlement to a continuous supply of substitute water as a condition for allowing Reclamation to use the reserved waters.  Article 12(a) of the 1956 Exchange Contract, titled "Conditional Permanent Substitution of Water Supply," provides:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the [Exchange Contractors] *so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise substitute water in conformity with this contract.*

ECF 204-2 at 6 (emphasis added).  Article 4(a) of the 1968 Exchange Contract includes identical language.  *Compare* ECF 204-3 at 7-8 *with* ECF 204-2 at 6.

By agreeing to this conditional exchange, the Exchange Contractors never relinquished their superior rights to San Joaquin River water.  In fact, the Exchange Contracts specifically preserved them.  Article 12 of the 1939 Exchange Contract, titled "Construction of Contract," pointedly states:

> This contract shall never be construed as a conveyance, abandonment or waiver of any water right, or right to the use of water of the [Exchange Contractors], or as conferring any right whatsoever upon any person, firm or corporation not a party to this contract, or to affect or interfere in any manner with any right of the [Exchange Contractors] to the use of the waters of the San Joaquin River, its channels, sloughs and tributaries, except to and in favor of the United States to the extent herein specifically provided.

ECF 207-1 at 17-18.  Identical provisions are found in the 1956 and 1968 Exchange Contracts.  *Compare id. with* ECF 204-2 at 26-27 (Article 24 of the 1956 Exchange Contract) *and* ECF 204-3 at 32 (Article 16 of the 1968 Exchange Contract).  The Exchange Contract, as originally executed and thereafter amended, also requires Reclamation to place all third parties, like the Friant Contractors, on written notice of the Exchange Contractors' reserved and superior rights when contracting for the use of San Joaquin River water, or memorialize the Exchange Contractors' superior rights in the subordinate contracts.  *See* ECF 207-1 at 14 (Article 7(k) of

the 1939 Exchange Contract); ECF 204-2 at 7 (Article 12(d) of the 1956 Exchange Contract); ECF 204-3 at 9 (Article 4(d) of the 1968 Exchange Contract).

In subsequently relegating Reclamation's use of San Joaquin River water under the Exchange Contract to last resort status in Article 3(n) of the 2010 Friant Contract, Reclamation was able to repurpose the water for the Friant Contractors' and other CVP purposes while, concomitantly, preserving the Exchange Contractors' reserved and superior rights. Nonetheless, when faced with competing demands and scarce supply, as experienced in 2014, Reclamation must afford the Exchange Contractors superior entitlement to CVP water. *See Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536, 1546-47 (E.D. Cal. 1994) (discussing superiority of Exchange Contractors' contractual rights to CVP water over other contractors, including the Friant Contractors).

Article 4 of the Friant Contract, titled "Time for Delivery of Water," further undermines plaintiffs' claimed entitlement. As required under Article 4(a), in mid to late February of each year, Reclamation's Contracting Officer is required to announce to the Friant Contractors the government's "initial declaration of the Water Made Available."[17]  ECF 204-4 at 25.  Updated at least monthly, the Contracting Officer's declarations are "based on then-current operational and hydrologic conditions." *Id.*  The Friant Contractors, in response and in accord with Article 4(b), submit written water delivery schedules, by month, that are "satisfactory to the Contracting Officer." *Id.*  Article 4(d), moreover, references the subordination clauses included in Article 3(a) and that the water delivery be made, "[p]rovided, [t]hat the total amount of water requested in that schedule or revision *does not exceed the quantities announced by the Contracting Officer . . . and the Contracting Officer determines that there will be sufficient capacity* available in the appropriate Friant Division Facilities . . . ." *Id.* at 26 (emphases added). Thus, consistent with the contractual provisions cited above, Article 4 limits Reclamation's quantitative water delivery obligations to the Friant Contractors by taking into account the Contracting Officer's assessment of current operational needs and hydrologic conditions. Reclamation's obligations are not dictated by plaintiffs' isolated, out-of-context, citation to the "shall make available for delivery" clause in Article 3(a). *See Wi-LAN USA, Inc. v. Ericsson, Inc.*, 574 F. App'x 931, 937 (Fed. Cir. 2014) ("In interpreting an unambiguous contract, the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby.") (cleaned up); *see, e.g.*, *Tehama-Colusa Canal Auth. v. U.S. Dep't of Interior*, 819 F. Supp. 2d 956, 965, 988 (E.D. Cal. 2011) ("The Bureau [of Reclamation] has contractual authority and administrative discretion over how it provides water service among the CVP's water and power-users, and how it picks its priorities among them." (citation omitted)).

For these reasons, Article 3 of the Friant Contract, read in context and in harmony with the surrounding and interrelated contractual provisions, cannot be interpreted to entitle the Friant Contractors to Class I San Joaquin River water without regard to their documented subordination to, among other competing interests, the contractual rights of the Exchange Contractors. *See,*

---

[17] Article 1(jj) defines "Water Made Available" as "the estimated amount of Project Water that can be delivered to the Contractor for the upcoming Year as declared by the Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract[.]"  ECF 204-4 at 16.

*e.g.*, *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed. Cir. 1997) (rejecting contract requirements interpretation because it "conflicted facially" with another contract provision).

      Plaintiffs' reliance on *Stockton East* is similarly misplaced.  In *Stockton East*, relevant to Reclamation's water delivery obligation, the pertinent portion of the contract at issue provides:

> The United States shall make available to the Contractor the annual quantities of agricultural water, up to a maximum quantity of 80,000 acre-feet, as specified in the schedule submitted by the Contractor in accordance with Article 4 and the Contractor shall pay for said water in accordance with Article 5: Provided, That the United States shall make available and the contractor shall pay for, as a minimum, such quantities of agricultural water specified below:
>
>     . . .
>
> [F]or years nine and 10 the minimum quantity of 56,000 acre-feet. . . .  Each year beginning in the eleventh year and continuing for the remaining contract term the quantity of water schedule in the eleventh year, which quantity shall be at least equal to or greater than the quantity made available and paid for in the tenth year. . . .

*Stockton E. Water Dist. v. United States* (*Stockton IV*), 761 F.3d 1344, 1350 (Fed. Cir. 2014); *see also Stockton E. Water Dist. v. United States* (*Stockton I*), 75 Fed. Cl. 321, 364-65 (reciting and interpreting relevant contractual language).  Based on the above-quoted contractual language, this Court concluded: "The Build-Up Schedule contained in Article 3 of the 1983 Contracts provides for *a minimum annual supply* that specifies that [identified] water needs are to be addressed."  *Stockton E. Water Dist. v. United States (Stockton II)*, 76 Fed. Cl. 470, 488 (2007) (emphasis added); *see also Stockton E. Water Dist. v. United States (Stockton III)*, 109 Fed. Cl. 460, 466-67 (2013) (reiterating that the relevant contract provisions "provide the following Build-Up Schedule of annual minimum quantities of water (in acre-feet) that Reclamation was obligated to make available from 1993 through 2004").  Ultimately, "[t]his Court found that Reclamation's failure to provide the minimum quantities of water listed in the Build-Up Schedule violated the requirements of Article 3, but held that Reclamation would not be liable for breach if it had a valid excuse under the Contracts for its non-performance."  *Stockton III*, 109 Fed. Cl. at 467 (citing *Stockton II*, 76 Fed. Cl. at 489; *Stockton I*, 75 Fed. Cl. at 365-66).  On appeal, the Federal Circuit affirmed the above finding, explaining: "Based on the plain language of the contract, discussing Reclamation's obligation to 'make available' certain quantities of water, we agree with the way in which the trial court defined the breach in this case . . . ."  *Stockton IV*, 761 F.3d at 1351.

      The Friant Contract presented in this case differs from the contract terms at issue in *Stockton East* in at least two material aspects.  First, the Class I water to be made available to the Friant Contractors, capped at 40,000 acre-feet, remained subject to the Contracting Officer's assessment of current operational needs and hydrologic conditions; in contradistinction, the *Stockton East* plaintiffs were entitled to an increasing schedule "of annual minimum quantities

of water (in acre-feet) that Reclamation was obligated to make available from 1993 through 2004." *Compare* ECF 204-4 at 18, 25 *with Stockton III*, 109 Fed. Cl. at 466-67.  Second, the Friant Contractors' contractual rights are unequivocally subordinated to, among other competing interests, the contractual rights of the Exchange Contractors, whereas the water supply contracts in *Stockton East* contained no similar subordination clauses.  *Compare* ECF 204-4 at 18, 24 (examined above) *with Stockton II*, 76 Fed. Cl. at 489 (annual minimum purchase and supply schedules "subject to two conditions" involving schedules to *exceed* required minimum and application of minimum requirements in relevant years).

Plaintiffs' focus on the claimed availability of 279,600 acre-feet of San Joaquin River water Reclamation pooled and stored in Millerton Lake in the Spring of 2014—the majority of which was released for delivery to the Exchange Contractors between May and September of 2014, *see* Tr. at 153-54, 176 (Apr. 28, 2022) (ECF 226)—is equally unavailing.  Premised upon their interpretation of Article 3(a), plaintiffs assert that Reclamation should have made available to the Friant Contractors all water stored in Millerton Lake in excess of minimum pool requirements, 2013 carryover, and "health and safety" releases.[18]  Citing Article 4(b)(2) of the Exchange Contract in support of their argument, plaintiffs maintain that Reclamation is not "required to . . . retain water in storage" in Millerton Lake for future delivery to the Exchange Contractors and, if Reclamation engages in such practices, it risks breaching the Friant Contract.

As an initial matter, simply because a contract does not *require* a certain action, it does not necessarily follow that the contract *forbids* that action.  The cited language governs the action of "*retain[ing]*" water in storage in Millerton Lake" *during certain periods under limited circumstances of temporary interruption* under Article 4(b)(2) of the Exchange Contract, which as discussed *infra*, did not apply in 2014.  As for the purposed risk, the Court finds the following.  Reclamation's operational supply and deliver decisions are based upon forecasting and subject to updates based on changes in operational and hydrologic conditions.  In light of the severe drought and resulting water shortage in 2014, Reclamation announced across-the-board reductions in allocations, including to both the Exchange Contractors and the Friant Contractors.  *See, e.g.*, ECF 207-1 at 115-18 (Milligan Decl. ¶¶ 25, 27-28, 30-31, 37). Given the continued dry hydrology forecasted, Reclamation stored San Joaquin River water in Millerton Lake in anticipation of critical CVP needs, including compliance with the government's superior delivery obligations under the Exchange Contract over those under the Friant Contract.  *See* ECF 204-8 at 12 ("Reclamation retained San Joaquin River water in storage in Millerton Reservoir in anticipation of Central Valley Project needs including the possible need for releases to the Exchange Contractors in 2014.").

If, at any time relevant hereto, forecast models predicted improved CVP water supply or an actual increase in supply materialized that permitted larger allotments, the Contracting Officer likely would have adjusted Reclamation's water delivery declaration to increase allocations to the Friant Contractors, again, *subject to* fulfillment of other superior competing

---

[18] Through a tendered expert witness, plaintiffs aver that, out of the 279,600 acre-feet water stored in Millerton Lake in the Spring of 2014, Reclamation should have allocated to the Friant Contractors all "unobligated water" deducted by volume of water below minimum pool requirements, 2013 carryover water releases, health and safety water releases, and certain other water released to the Friant Contractors.  *See* ECF 214-1 at 8.

demands.  Indeed, despite taking priority over deliveries to the Friant Contractors, no releases were made at the Friant Dam for salmon under the SJRRSA due to other superior demands, including deliveries under the Exchange Contract.  *See* ECF 207-1 at 118 (Milligan Decl. ¶ 37); ECF 204-4 at 18 (Article 3(a)).  Given the extreme drought conditions of 2014 and the Exchange Contractors' superior entitlement to CVP water, Reclamation's last resort water supply source for the Exchange Contractors necessarily trumped the subordinated contractual rights of the Friant Contractors.

This remained true despite the fact that the sole source of water Reclamation uses to supply water to the Friant Contractors is San Joaquin River water impounded at the Friant Dam and stored in Millerton Lake.  *See* ECF 204-4 at 10 (Article 1(d) and (e) defining Class I Water and Class II Water as water supplied from Millerton Lake).  To conclude otherwise would effectively void the qualifying and subordination clauses memorialized in Articles 1(d), 3(a), 3(n), 4(d), 12(a), and 13(b) of the Friant Contract.  *See Westlands I*, 153 F. Supp. 2d at 1149 (rejecting plaintiffs' interpretation of water-supply contract because it "frustrates the necessary balancing of water rights [Reclamation] undertakes each year to discharge its statutory duty to properly operate the CVP as an integrated unit" and "violates basic principles of equity that would elevate plaintiffs, later-in-time water contractors, who have contributed very little to the creation or operation of the CVP, to an equal priority with the Exchange Contractors . . .").

At bottom, the Friant Contractors' claimed entitlement to the San Joaquin River water pooled in Millerton Lake in 2014 is contrary to the express terms of the Friant Contract as well as the Exchange Contract (further discussed *infra*).  As such, plaintiffs' breach of contract claim fails as a matter of law.  "It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions."  *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997) (citations omitted).  Adherence to this fundamental principle compels this conclusion.

## III.   COMPLIANCE WITH THE EXCHANGE CONTRACT

As explained in Section II, *supra*, in addressing the Exchange Contractors' superior rights to San Joaquin River water, Article 3(n) of the Friant Contract nevertheless prohibited Reclamation from delivering San Joaquin River water to the Exchange Contractors "unless and until required by the terms of [the Exchange Contract]."  ECF 204-4 at 24.  Accordingly, to complete the assessment of whether the government breached the terms of the Friant Contract, the Court must determine whether Reclamation was required to deliver San Joaquin River water to the Exchange Contractors in 2014 to satisfy its obligations under the Exchange Contract.

To delineate Reclamation's water delivery obligations to the Exchange Contractors, the Court, again, begins with the contractual language.  The 1968 Exchange Contract, operative in 2014, recites the historical context of Reclamation's acquisition of rights to San Joaquin River water from the Exchange Contractors through, as described above, the 1939 purchase and conditional exchange.  *See* ECF 204-3 at 4-6.  Article 4(a) of the Exchange Contract, titled

"Conditional Permanent Substitution of Water Supply," restates the conditional exchange embodied in the 1956 and 1939 Exchange Contract:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid *reserved waters* of said river for beneficial use by others than the [Exchange Contractors] *so long as, and only so long as*, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise *substitute water in conformity with this contract*.

ECF 204-3 at 7-8 (emphases added); *see* ECF 204-2 at 6 (Article 12(a) of the 1956 Exchange Contract) (same); ECF 207-1 at 7 (Article 7 of the 1939 Exchange Contract) (similar).  This conditional exchange initially supplied and continues to supply the water that enables the Friant Division to operate and is readily distinguishable from the Friant Contractors' water supply service purchased through payment.  *See Westlands Water Dist.*, 864 F. Supp. at 1545 ("The Exchange Contract does not contemplate the same type of supply and repayment that other water districts have, as described in 43 U.S.C. § 390bb(1).").

Moreover, as explained in Section II, *supra*, in agreeing to this exchange, the Exchange Contractors never relinquished their superior rights to San Joaquin River water; on the contrary, the Exchange Contract specifically disavows any "conveyance, abandonment, or waiver" of their rights.  *See* ECF 207-1 at 17-18 (Article 12 of the 1939 Exchange Contract); ECF 204-2 at 26-27 (Article 24 of the 1956 Exchange Contract); ECF 204-3 at 32 (Article 16 of the 1968 Exchange Contract).  Indeed, Article 4(b) of the Exchange Contract, discussed further below, provides: "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River . . . .*"  ECF 204-3 at 8 (emphasis added). And, when the inability to deliver is "permanent," the Exchange Contractor "shall receive [their] reserved waters of the San Joaquin River."  *Id.* at 8-9 (Article 4(c)).

The term "reserved waters," as defined and used in the Purchase Contract and Exchange Contract, refers to the San Joaquin River water the Exchange Contractors held in reserve "for the irrigation of lands and for other purposes" in certain lands downstream from the Friant Dam. *Compare* ECF 204-3 at 5-6 (Exchange Contract Recital referencing "Schedule 1" included in the Purchase Contract) *with* ECF 204-1 at 4-5 (Article 9(a) of the Purchase Contract which includes Schedule 1).  "Substitute water," in turn, is broadly defined in Article 3 of the Exchange Contract as "*all* water delivered hereunder at the points of delivery hereinafter specified to the [Exchange Contractors], *regardless of source*."  ECF 204-3 at 7 (emphases added).

In contrast to reserved waters measured in "mean 24-hour flow in cubic feet per second," *see* ECF 204-1 at 5 (Schedule 1), the Exchange Contract sets forth the required deliveries of substitute water in units of "acre-feet."  *See* ECF 204-3 at 18-19 (Article 8).  The aggregate annual amount of substitute water the Exchange Contractors are entitled to receive is dependent upon current hydrological conditions and whether, under Article 7 of the Exchange Contract, the year is deemed a "Critical Calendar Year."  *See id.* at 17-18.  Under Article 8 of the Exchange Contract, titled "Quantity of Substitute Water," in each calendar year "other than those defined

as critical," the Exchange Contractors are entitled to "an annual substitute water supply of not to exceed 840,000 acre-feet" broken down into monthly maximum allotments. *Id.* at 18-19. Controlling here, as the parties do not dispute that 2014 was properly determined to be a "Critical Calendar Year":

> During all calendar years defined as critical, the United States shall deliver for such use an annual substitute water supply of not to exceed 650,000 acre-feet in accordance with the following maximum monthly entitlements:

| January | 15,000 acre-feet |
| February | 30,000    ″     ″ |
| March | 85,000    ″     ″ |
| April | 81,000    ″     ″ |
| May | 99,000    ″     ″ |
| June | 102,000    ″     ″ |
| July | 107,000    ″     ″ |
| August | 97,000    ″     ″ |
| September | 55,000    ″     ″ |
| October | 29,000    ″     ″ |
| November | 25,000    ″     ″ |
| December | 15,000    ″     ″ |

> provided that the total for (1) the 5 months January, February, March, November and December shall not exceed 121,000 acre-feet, and (2) the total for the period April through the following October shall not exceed 529,000 acre-feet.

*Id.* at 19-20 (table graphic added for clarity).  Article 8 further outlines the water allocation and delivery processes as follows.  On or about February 15, Reclamation informs the Exchange Contractors of its forecast for that year (i.e., critical or non-critical) and, thereafter, shares any material updates. *Id.* at 21.  In turn, the Exchange Contactors "furnish estimates of their aggregate monthly delivery requirements and their daily delivery schedules for each weekly period . . . to [Reclamation] at least 48 hours before beginning of the delivery period." *Id.* at 20-21.

Contrary to plaintiffs' argument, the phrase "not to exceed" as used in Article 8 of the 1968 Exchange Contract is not meant to denote only a *maximum* water delivery requirement, entitling the Exchange Contractors to *no minimum* substitute water.  Such an interpretation ignores the interconnected provisions of the contract and, more fundamentally, undermines the foundation of the conditional exchange. *See McAbee Const.*, 97 F.3d at 1435 ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."); *Wi-LAN*, 574 F. App'x at 937 (quoted above).

Read as a whole and in context, Article 8 obligates Reclamation to deliver, in a critical year, quantities of substitute water in accordance with the Exchange Contractors' "estimates of their aggregate monthly delivery *requirements*," subject to corresponding "maximum monthly *entitlements*" and capped at 650,000 acre-feet. *See* ECF 204-3 at 19-21 (emphases added).  The

terms employed—"requirements" and "entitlements"—are not discretionary.  *See Entitlement*, Black's Law Dictionary (11th ed. 2019) ("An absolute right to a . . . benefit[.]"); *Requirement*, Black's Law Dictionary (11th ed. 2019) ("Something that must be done because of a law or rule; something legally imposed, called for, or demanded . . . .").  A comparison of the aggregate maximum monthly entitlements to the annualized cap, as well as an examination of the evolution of this contractual provision, further supports this conclusion.

The specified "maximum monthly entitlements" listed in Article 8 for a critical year total 740,000 acre-feet—i.e., 90,000 acre-feet *more* than the "not to exceed" annual total of 650,000 acre-feet.  The perceived mathematical inconsistency is clearly intended to give the Exchange Contractors some flexibility in adjusting their monthly water supply requirements depending upon actual need while, concomitantly, providing predictability to Reclamation and capping the government's obligated delivery at the agreed upon annual maximum.  Apportioned within the maximum monthly entitlements, the Exchange Contractors are entitled to demand the full complement of 650,000 acre-feet of water in a critical year and, in that case, the substitute water supply of 650,000 acre-feet would function as both the minimum and maximum Reclamation is obligated to deliver.  Since the Exchange Contractors effectively "prepaid" for the maximum supply of water every year through the exchange, and there is no refund for demanding less than the annual maximum, there is little incentive for the Exchange Contractors not to demand their full entitlement.

The structural evolution of the quantitative requirements is consistent with and confirms the above interpretation and elucidates the parties' intent.  *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, [courts] have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning.") (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003)).  The original 1939 Exchange Contract did not require a quantitative "acre-feet" allocation; rather, the relevant contractual provision generally obligated Reclamation to furnish "a water supply (including substitute water) equal in quantity to that reserved by [the Exchange Contractors]" based upon the natural flows in the San Joaquin River.  *See* ECF 207-1 at 7 (Article 7).  Through the 1956 amendments, the parties replaced the fluctuating natural flow-based requirements with more predictable and concrete schedules measured in acre-feet.  *Compare id. with* ECF 204-2 at 12-18 (Articles 15-16 of the 1956 Exchange Contract).  More specifically, the parties introduced the concept of a "critical year" and obligated Reclamation to deliver to the Exchange Contractors "an annual substitute water supply of 665,000 acre[-]feet . . . [d]uring all calendar years defined as critical" (855,000 acre-feet in non-critical years), according to *fixed* monthly quantities specified for each month, January through December.  *See* ECF 204-2 at 14-15.  As a precursor to the 1968 Amendment, subject to certain conditions, the 1956 Exchange Contract authorized the Exchange Contractors to request up-or-down percentage adjustments to the otherwise fixed monthly distributions (e.g., maximum 10% adjustment for November through the following March).  *See id.* at 15-16.

The 1968 Exchange Contract maintained the critical versus non-critical year distinction and similarly reduced annual water supply requirements during critical years.  However, the parties replaced the permissible monthly percentage-based adjustments with the more flexible

"maximum monthly entitlements" described above. To implement the monthly and annual calculations of this amendment, the monthly allocations in the 1968 Exchange Contract were adjusted to those found in the table graphic above. *Compare* ECF 204-2 at 14-15 *with* ECF 204-3 at 18-19. The 15,000 acre-feet reduction in the annual cap regardless of whether the year is defined as critical, *compare* ECF 204-2 at 14-15 *with* ECF 204-3 at 18-19, reflects the deal reached for the additional monthly flexibility secured by the Exchange Contractors.

At bottom, under Article 8, the Exchange Contractors were entitled to demand and receive 650,000 acre-feet of CVP (substitute) water from Reclamation in 2014. Due to the extreme drought conditions, the Exchange Contractors agreed to compromise. Reclamation ultimately delivered approximately 540,000 acre-feet of water to the Exchange Contractors in water year 2014—roughly 110,000 acre-feet shy of the critical-year total entitlement. Of this aggregate amount, approximately 209,000 acre-feet consisted of San Joaquin River water pooled in Millerton Lake and released at the Friant Dam. *See* ECF 207-1 at 120-22; ECF 204-7 at 2-3; ECF 204-14 at 2 (Steiner Dep. Tr. at 42:12-23). Because Reclamation was contractually and legally required to deliver the as-delivered CVP (substitute) water to satisfy the Exchange Contractors' water entitlements—superior to the Friant Contractors' rights—the government's compliance with the express terms of the Exchange Contract cannot constitute a breach of the Friant Contract.

In examining Reclamation's administration of the Exchange Contract, Article 4(b) proved somewhat inartfully drafted but, nevertheless, capable of harmonious interpretation with the surrounding contractual provisions and the fundamental exchange agreement. Titled "Temporary Interruption of Delivery," the contractual provision provides: "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River*" in accordance with a modified schedule outlined in subsections 4(b)(1)-(2). ECF 204-3 at 8 (emphasis added).

Under plaintiffs' interpretation, Article 4(b) is triggered whenever Reclamation is unable to deliver the full Article 8 quantities *exclusively* from non-San Joaquin River sources; and, when Reclamation taps into the San Joaquin River to satisfy its obligations under the Exchange Contract, the Exchange Contractors receive a reduced water supply consistent with the schedule included in subsections 4(b)(1)-(2). Plaintiffs contend that under the delivery schedule included in Article 4(b), the Exchange Contractors would have received less San Joaquin River water in 2014, leaving residual water that should have been made available to the Friant Contractors.

The government's counterargument is similarly two-fold. First, the United States maintains that all CVP water—including San Joaquin River water—can be used as "substitute water" under the Exchange Contract to satisfy the Article 8 requirements. *See Westlands I*, 153 F. Supp. 2d at 1166 ("The 1939 Exchange Contract commits the United States to provide substitute water to the Exchange Contractors from any source selected by Interior in its discretion, not necessarily from either the CVP or the San Luis Unit."). Second, with regard to Article 4(b), the United States maintains that it was never triggered because Reclamation was never *unable* (temporarily or otherwise) to deliver substitute water from non-San Joaquin

River sources in 2014 (albeit not the full Article 8 quantities); and Article 4(b) is only triggered when the United States is unable to deliver water at all from the Delta-Mendota Canal or other non-San Joaquin River sources.  Although initially skeptical of the government's argument, the Court's doubts waned.  In contrast to the plaintiffs' position, the government's interpretation supplies a harmonized reading of the contract as a whole.

Article 3 of the Exchange Contract, more fully quoted above, broadly defines "substitute water" as including "*all water* delivered hereunder at the points of delivery hereinafter specified to the [Exchange Contractors], *regardless of source*."  ECF 204-3 at 7 (emphases added). Included among the "Delivery Points" listed in Article 5(d) are points along the San Joaquin River, and the Mendota Pool which receives upper San Joaquin River water for delivery.  *Id.* at 11-13.  Similarly, in addressing the quality of the substitute water to be delivered, Article 9(f) discusses the situation "[w]hen 90 percent or more of the total water being delivered to the [Exchange Contractors] is *coming from the San Joaquin River* and/or Fresno Slough, then *the quality of San Joaquin River water* at [the] Whitehouse [gauging station[19]] shall be used as the basis for quality computations."  ECF 204-3 at 25 (emphases added).  This contractual provision further provides quality computations for "[w]hen less than 90 percent of the total water being delivered to the [Exchange Contractors] is *coming from the San Joaquin River* and/or the Fresno slough . . . ."  *Id.* (emphases added).  Article 11, outlining Mendota Pool operations, further discusses the delivery of San Joaquin River water to the Mendota Pool under the contract, as well as deliveries from the Delta-Mendota Canal.  *Id.* at 27.  The contracting parties therefore contemplated and specifically addressed deliveries of San Joaquin River water as substitute water "at the points of delivery … specified" to the Exchange Contractors.  *See id.* at 7.

Although the parties to the Exchange Contract "anticipated that most if not all of the substitute water provided the [Exchange Contractors under the contract] will be delivered to them via the . . . Delta-Mendota Canal," *see id.* at 9 (Article 5(a)), this contractual provision did not foreclose the use of San Joaquin River water as substitute water.  Indeed, as quoted above, Articles 4(a) and 4(d)—sandwiching the debated Article 4(b)[20]—make clear that the Exchange Contractors are entitled to San Joaquin River water over any water service contractors, including the Friant Contractors, even though it is relegated to a last resort source under the Friant Contract.  A contrary interpretation would prioritize the clearly subordinated contractual rights of the Friant Contractors over the superior rights of the Exchange Contractors.  *Accord Westlands I*, 153 F. Supp. 2d at 1149 (rejecting water service contractors' contractual

---

[19] The Whitehouse gauging station is a San Joaquin River flow-measuring station located below the Friant Dam and above where Lone Willow Slough takes water from the San Joaquin River—the same station where the Exchange Contractors' reserved San Joaquin River waters are measured.  *See* ECF 204-1 at 5 (measurement of reserved waters at the Whitehouse gauging station); *see, e.g.*, State of California, Department of Public Works, Division of Water Resources: *Report of Sacramento-San Joaquin Water Supervision for 1953 (October 1954)*, at 106 (Table 113 showing flow records of San Joaquin River measured at Whitehouse station located at Mile 219.83R), *available at* https://cawaterlibrary.net/wp-content/uploads/2019/12/Bulletin_16__1954.pdf (last viewed June 2, 2022); *accord McFarland v. Superior Ct. of Merced Cnty.*, 194 Cal. 407, 417 (1924) (testimony describing location of the Whitehouse gauging station).

[20] As noted above, Article 4(c), inapplicable here, addresses the situation where Reclamation is "permanently unable" to deliver substitute water to the Exchange Contractors.  *See* ECF 204-3 at 8-9.

interpretation because it "violates basic principles of equity that would elevate plaintiffs, later-in-time water contractors, . . . to an equal priority with the Exchange Contractors, senior water rights holders, who own conditionally-reserved senior and pre-existing riparian and pre–1914 appropriative water rights on the San Joaquin River," which enabled operation of the CVP).

      For these reasons, the Court concludes that Reclamation necessarily tapped San Joaquin River water to satisfy the government's superior contractual and legal obligations under Article 8 of the Exchange Contract.  Consequently, there was no breach of Article 3(n) of the subordinate Friant Contract.  The undeniable reality is, in 2014, Reclamation was tasked with navigating competing demands for CVP water in the midst of a historic drought.  *See, e.g.*, ECF 207-1 at 120-21.  Despite looking elsewhere before using San Joaquin River water to meet the delivery requirements under the Exchange Contract, water scarcity left Reclamation with no other choice.  *See id.* at 154 (Jackson Dep. Tr. at 62:6-8) ("Friant was the only other source that was available to Reclamation.").  The Court finds that Reclamation's 2014 allocations and deliveries were in accordance with the express terms of the Exchange Contract and the Friant Contract.

## IV.   IMMUNITY UNDER THE FRIANT CONTRACT

      The Court's conclusion that Reclamation did not breach the Friant Contract is further supported by the immunity clause included in the Friant Contract.  Under the title "Constraints on the Availability of Water," Article 13(b) of the Friant Contract provides in relevant part:

> If there is a Condition of Shortage because of . . . *drought . . . or actions taken by the Contracting Officer to meet legal obligations*, including but not limited to obligations pursuant to the [SJRRSA] then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

ECF 204-4 at 50 (emphases added).  Article 19(a), in turn, states:

> Where the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.  Both parties, notwithstanding any other provisions of this Contract, expressly reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious, or unreasonable opinion or determination.  Each opinion or determination by either party shall be provided in a timely manner.  Nothing in this Article of this Contract is intended to or shall affect or alter the standard of judicial review applicable under Federal law to any opinion or determination implementing a specific provision of Federal law embodied in statute or regulation.

*Id.* at 58.  Read together, the Friant Contract effectively immunizes the government from a breach of contract claim where, as here, the Court finds that the water allocation decisions and actions of the Contracting Officer in the face of a severe drought, coupled

with Reclamation's legal obligations under the Exchange Contract,[21] were not "arbitrary, capricious, or unreasonable."

In 2014, in addition to the negotiated reduced substitute water deliveries to the Exchange Contractors (below even critical year entitlements) and the zero allocation for the Friant Contractors, the severe drought adversely impacted Reclamation's overall CVP operations. *See* ECF 207-1 at 153 (Jackson Dep. Tr. at 53:8-54:2) (discussing reductions in contract allocations, refuge supply and water required for winter-run salmon); *id.* at 115, 116, 118 (Milligan Decl. ¶¶ 27, 30, 37) (discussing reduction in contract allocations and deliveries, refuge supply, and restoration flows). To be clear, a zero allocation for the Friant Contractors was harsh and, in the eyes of the Friant Contractors, patently unfair particularly since the Exchange Contractors received their maximum entitlement for the critical months of April through October. Nonetheless, the parties' contractual arrangements and relative entitlement hierarchy do not compel a different result.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment (ECF 204) is **DENIED**. Defendant's and defendant-intervenors' cross-motions for summary judgment (ECF 207, 208) are **GRANTED** as to breach of contract liability. The Clerk is directed to **ENTER** judgment accordingly. No costs.

**IT IS SO ORDERED**.

_____
Armando O. Bonilla
Judge

---

[21] In addition to the superior contractual obligations owed the Exchange Contractors, Reclamation constructed and operates the CVP to fulfill myriad legal obligations under federal and state law. *See* ECF 204-4 at 5 (1st Recital); *San Luis & Delta-Mendota Water Auth.*, 672 F.3d at 682-83; ECF 207-1 at 105, 107-08, 111-13, 115-16, 118 (Milligan Decl. ¶¶ 2c, 5, 6, 8, 15-18, 27, 30-32, 37) (outlining Reclamation's federal and state legal obligations in operating the CVP and Reclamation's corresponding water allocations in 2014).